**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
RITA BOWERS, et al.,                )
                                    )
                    Plaintiffs,     )
                                    )
v.                                  )        Civil Action
                                    )        No. 22-cv-10457-PBS
JOHN H. RUSSELL, et al.,            )
                                    )
                    Defendants.     )
_____ )

<u>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER</u>

May 29, 2026

Saris, J.

<u>INTRODUCTION</u>

This case concerns a family business.[1] The family at issue is the Russell family, whose members the Court refers to by first name to avoid confusion. The business is Russelectric, an electrical equipment manufacturing company founded and owned by Raymond Russell.

Facing the threat of divorce from his wife Carol, Raymond created an employee stock ownership plan (the "ESOP" or the "Plan").[2] Three of the couple's four children -- John, Suzanne,

---

[1] In HBO's <u>Succession</u>, Shiv Roy says, "Family and business are dangerously close." This litigation exemplifies that lesson.

[2] An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 573 U.S. 409, 412 (2014).

and Lisa ("Defendants") -- took Carol's side in the divorce and opposed the ESOP from its inception.

It came as no surprise, therefore, that when given the opportunity in 2016, John -- who was then Chairman of the Board of Directors of Russelectric (the "Board") following his father's death -- embraced the opportunity to terminate the ESOP and redeem its shares. The ESOP's participants received payments for the shares that were allocated to their individual accounts, but not for shares that had not yet been allocated. Several years later, participants received clawback payments stemming from a sale of Russelectric to Siemens -- but again, only in proportion to the allocated shares, not the unallocated ones. In connection with the Siemens transaction, the Russell children also awarded bonuses to themselves and others in their family, the Board, and Russelectric management. The bonuses effectively reduced the amount of the clawback payments to plan participants.

This litigation ensued. Named plaintiffs Rita Bowers, Michele Gear-Cole, Florence Lorenzano, and Reginald Tercy are four former Russelectric employees who represent a certified class of past ESOP participants (collectively, "Plaintiffs"). Plaintiffs assert that John committed violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in relation to the redemption transaction and the negotiation and administration of the accompanying clawback provision. They

further allege that Suzanne and Lisa knowingly participated in, and benefitted from, those violations. The crux of Plaintiffs' claims is that Defendants should have included unallocated shares in the clawback provision, that all shares were undervalued in the redemption transaction, and that Defendants unlawfully reduced the clawback payments by awarding bonuses.

The Court held a twelve-day bench trial in September and November 2025. It now issues the following findings of fact and conclusions of law regarding Plaintiffs' ten ERISA claims. As the Court will explain, it finds that Plaintiffs have failed to show that the clawback provision should have included unallocated shares. It further concludes that Defendants have demonstrated that the redemption transaction was for fair value. Plaintiffs have, however, met their burden in establishing that several of the bonus payments were excessive and a breach of fiduciary duty.

Accordingly, judgment will enter for Plaintiffs in part and Defendants in part. As the Court will explain, judgment will enter for Plaintiffs against John on Counts VII and VIII and against all Defendants on Count X. Supplemental briefing is ordered regarding the exact calculation of damages.

## FINDINGS OF FACT

The Court makes the following findings of fact based on the testimony and exhibits presented at the bench trial.[3]

### I.    Formation of the ESOP

Russelectric was a company that manufactured electrical equipment such as switch gears and transfer switches. Tr. 1-26:16-24. The company was founded by Raymond Russell. Tr. 4-89:11-14. Raymond and his wife Carol had four children: John, Suzanne, Lisa, and James. Tr. 3-11:18-19.

The ESOP was formed on October 4, 2010, at Raymond's direction. Tr. 1-10:22-11:4, 14:17-21. Argent Trust Company ("Argent") was named as trustee of the ESOP. Tr. 1-7:16. At issue in this litigation are the actions taken by the three elder Russell children -- John, Suzanne, and Lisa -- with respect to the ESOP.

In the formation transaction, Russelectric lent money to the ESOP, and the ESOP used the loan proceeds to purchase approximately $22 million in Russelectric shares to be used as collateral for the loan. Tr. 1-9:4-8, 14:22-24. The shares were held in a suspense account; as contributions were gradually made by Russelectric to the ESOP, the loan was repaid and the shares were allocated to

---

[3] Record citations are to the trial transcripts (e.g., "Tr. 1" is the transcript from the first day of trial), deposition testimony played at trial (e.g., "Martin Dep." is the transcript of the deposition testimony of Steve Martin), or an exhibit admitted at trial (e.g., "Ex. 245").

individual employees' participant accounts. Tr. 1-9:9-16. Once placed in individual participant accounts, the shares became known as "allocated shares"; before that time, they were considered "unallocated shares." Tr. 1-9:21-10:1, 10:8-12. Under the ESOP plan document, in the event Russelectric terminated the ESOP, the proceeds of the unallocated shares would be used to repay the outstanding loan, with any remaining proceeds to be allocated to participants. Ex. 245. If the unallocated shares were not valued high enough to pay off the loan at that time, they would be returned to the company and the outstanding loan balance would be forgiven. Ex. 245; Tr. 2-26:7-11.

At the time the ESOP was formed, Raymond and Carol were embroiled in bitter divorce proceedings. Tr. 4-87:18-20. John, Suzanne, and Lisa took Carol's side in the divorce. Tr. 4-88:1-12. In Carol's and the children's view, Raymond formed the ESOP in order to "defraud [Carol] out of her marital estate." Tr. 4-88:15-18. In particular, after the ESOP was created, Raymond and Carol held a 35% interest in Russelectric, while the ESOP held a 30% interest. Tr. 3-31:3-10, 38:19-21. The creation of the ESOP thus ensured that Carol could not win more than half of the company in the divorce proceedings. Tr. 4-89:11-19. As a result of Raymond's suspected machinations, John hated the ESOP, believing that it "was the cause of [his] parents' divorce." Tr. 4-88:15-18. As John

candidly testified, he "was not a fan of the ESOP." Tr. 4-88:15-18.

## II.  <u>Corporate Governance of Russelectric</u>

After the death of their parents, the Russell children became majority owners of Russelectric, holding 70% of its shares (via a series of trusts) while the ESOP held 30%. Tr. 3-32:13-16; Ex. 90. The corporate governance of Russelectric was set forth in a Mediation Settlement Agreement (the "MSA") ensuing from the divorce proceedings. Tr. 2-17:12-15. The MSA dictated that the Board include three members, two of which would be independent from the Russell family. Tr. 2-17:22-25. In April 2015, Dennis Long and Denise Wyatt were selected as the two independent Board members, while John served as the third member and Chairman. Tr. 1-5:11-25, 14:25-15:2; Tr. 3-29:3-5; Tr. 4-86:8-10.

The MSA also created an "Advisory Board" consisting of several Russell family members: Suzanne, Lisa, James, Jennifer Novak (Suzanne's daughter), and Matthew Russell (John's son). Ex. 40; Tr. 1-119:3-8; Tr. 3-10:13-14, 11:18-19; Tr. 5-121:16-23. The members of the Advisory Board were not actively involved in corporate governance, but they frequently attended Board meetings to learn more about the company with the objective of eventually helping lead the business. Tr. 1-119:21-22; Tr. 3-85:4-8; Tr. 5-121:7-9. Advisory Board members were paid approximately $40,000 per year. Tr. 1-119:10-12.

6

### III. <u>Clawback Negotiation</u>

On September 24, 2015, Russelectric's Board (<u>i.e.</u>, John, Long, and Wyatt) voted to terminate the ESOP. Tr. 1-22:3-16; Ex. 8. The ESOP would terminate in 2016, and its shares would be redeemed. Tr. 1-22:3-16. In conjunction with the termination of the ESOP, the Board also voted to freeze Russelectric's defined benefit (<u>i.e.</u>, pension) plan and to enhance the company's 401(k) plan by adding an employer contribution. Tr. 1-78:17-23, 79:8-10, 81:11-13.

At the time of the Board's decision, the ESOP's trust agreement specified that Argent was a "directed trustee as described in ERISA § 403(a)." Ex. 75; <u>see</u> Tr. 1-49:10-13, 21-23; 29 U.S.C. § 1103(a)(1) (allowing a trustee to be expressly made "subject to the direction of a named fiduciary"). In particular, Argent was made "subject to the direction of the Company" – <u>i.e.</u>, Russelectric. Ex. 75. By resolution of Russelectric's Board, John, as Chairman, was given the authority to "terminat[e]" all agreements with Argent and to replace Argent at any time with a different ESOP trustee. Ex. 8; Tr. 1-24:4-15.

Despite being contractually considered a "directed trustee," Argent viewed itself as having the discretion and responsibility to negotiate fair termination terms for ESOP participants. Tr. 4-26:9-12. The first set of negotiations took place primarily between Long (one of Russelectric's two independent Board members) and

Steve Martin of Argent. Tr. 1-29:2-4. When Long informed Martin of the Board's decision to terminate the ESOP by buying out its shares, Martin requested a three-year "clawback" provision. Tr. 1-28:15-20, 29:4-12. The clawback provision, as finally executed on March 28, 2016, Tr. 1-56:20-22, provided that if a "Change of Control Transaction" occurred within three years of the ESOP's termination, plan participants would

> receive a cash payment equal to the product of (A) the number of the Company's common stock allocated to such participant's account in the ESOP as of the ESOP Termination Date multiplied by (B) the difference between (i) the per share price of the Company's common stock as of the ESOP Termination Date as determined by a valuation report to be prepared by Prairie Capital; and (ii) the net per share purchase price received by the shareholders of the Company upon the Consummation of the Change of Control Transaction.

Ex. 69. In other words, if Russelectric was sold within three years at a price higher than that paid upon the termination of the ESOP, the ESOP's participants would receive a portion of that premium commensurate with the number of their allocated shares. The clawback provision did not entitle participants to any amount based on the value of unallocated shares. Tr. 1-37:5-7.

The negotiation of this clawback provision was straightforward. After Martin requested the provision, Russelectric's corporate counsel, David Barbash, drafted it and sent it to Martin. Tr. 1-34:25-35:7, 39:12-21; Ex. 729. Three days later, Martin responded, stating that Argent had reviewed the

provision and accepted it. Tr. 1-40:20-25; Ex. 729. Martin had discussed the clawback with his colleagues, and Argent's counsel reviewed the provision. Martin Dep. 53:10-54:03; Tr. 4-27:10-16. Upon receiving Martin's acceptance of the provision, Long forwarded Martin's email to John and several others, writing, "I still expected [Martin] to have counsel review. This is a good result." Ex. 732. Similarly, Barbash wrote, "That was easier than I anticipated." Ex. 729.

John, along with Long and Wyatt, voted to approve the clawback agreement in his capacity as a Board member. Tr. 5-14:14-16. He was not otherwise involved in the clawback negotiation, from which he recused himself. Tr. 4-115:13-18.

## IV.   **Financial Improvement of Russelectric**

At the time the Board decided to terminate the ESOP, Russelectric was in freefall. The company's financial performance had peaked in 2010 and then steadily diminished, hitting rock bottom in 2016. Tr. 4-120:15-121:1. In May 2016, in an effort to save the company, John selected a new Chief Executive Officer ("CEO"): Dorian Alexandrescu, an immigrant who had fled political persecution in Romania and then built a career in the electrical products industry. Tr. 1-55:12-16; Tr. 3-8:11-16; Tr. 7-133:14-15, 134:23-135:4, 135:20-136:14.

John's decision to hire Alexandrescu proved to be Russelectric's saving grace. Throughout the fall of 2016 and in

2017, Alexandrescu gradually made major improvements to the company. Tr. 2-55:21-56:2. He built out a new management team, including a new Chief Financial Officer ("CFO") named Raul Tejada, who began work in October 2016 and became CFO in January 2017, and a new Vice President of Operations, who began work in October 2016. Tr. 1-76:1-3; Tr. 2-21:19-22:3, 54:24-55:1; Tr. 8-17:8-20, 18:9-16. He also changed the company's financial reporting structure, Tr. 2-22:4-18; developed new markets and products, Tr. 2-23:9-15; Tr. 5-76:3-6; reorganized the sales force, Tr. 8-12:20-13:8; and enhanced aftermarket sales, such as upgrades to the company's products, Tr. 8-13:23-14:17. On the operations side, Alexandrescu introduced "lean manufacturing," which entailed a fundamental redesign of Russelectric's factories to improve efficiency. Tr. 2-22:19-23:1.

Largely due to Alexandrescu's interventions, Russelectric's financial performance improved in late 2016 and 2017. Beginning around October 2016, the company's backlog -- i.e., confirmed orders yet to be fulfilled -- had begun to increase. Tr. 8-23:2-4. Likewise, as of late November 2016, the company's bookings and revenue had increased in comparison to late June, though many of the sales and bookings did not come to fruition until mid-2017. Tr. 1-76:24-77:1, 77:5-8; Tr. 8-20:1-10. By the end of 2016, Russelectric's outlook had been stabilized, leading to improvement in 2017. Tr. 5-70:21-71:8.

10

While these developments were gradually occurring, Russelectric's stock was undergoing an annual financial valuation conducted by Prairie Capital. Tr. 1-13:8-10; Ex. 99. Much of the valuation process occurred in September 2016, and Prairie Capital published the final valuation on October 11, 2016. Tr. 8-36:12-17, 38:6-21; Ex. 99. Although the valuation was published in October 2016, it valued Russelectric's stock as of June 30, 2016. Ex. 99. According to the final valuation report, which was presented to Russelectric's Board, Prairie Capital determined that the company's stock was worth approximately $121 per share as of June 30, 2016. Tr. 1-65:23-25;  Exs. 99, 472.

Prairie Capital's valuation was largely based on financial information and projections provided to it by Russelectric's management, including Alexandrescu. Tr. 2-40:4-7; Tr. 8-38:19-21. Alexandrescu gave Prairie Capital the same budget projections that he provided to the Board. Tr. 8-38:19-21. He informed Prairie Capital of new opportunities in product development, sales channels, market development, aftermarket sales, and lean manufacturing. Tr. 8-41:11-45:13; Ex 188. Prairie Capital's valuation was also reviewed by Argent, which determined that Prairie Capital had used appropriate financial adjustments and projections. Tr. 4-32:2-25.

## V.    Redemption Transaction

The dissolution of the ESOP (by way of the redemption of its shares) was scheduled to occur on November 30, 2016. Tr. 1-64:20-22. In anticipation of this redemption transaction, the Board entered a new engagement agreement with Argent, which specified that Argent would act as a "discretionary trustee" (rather than a "directed trustee") with respect to the transaction. Tr. 1-49:3-7, 51:7-10; Ex. 124. The agreement gave Argent the right to "approve or disapprove the proposed transaction," Tr. 2-31:15-16, and stated that "Argent will assume the fiduciary responsibility for determining . . . whether the price the [c]ompany pays the ESOP for the stock in the [p]roposed [t]ransaction is adequate consideration, and whether the [p]roposed [t]ransaction is fair from a financial viewpoint to the ESOP and its participants." Ex. 124; see Tr. 2-30:20-25.

Based on this engagement agreement, the Board viewed itself as adverse to Argent in negotiating the redemption price, with Argent representing the ESOP and the Board representing the company as a whole. Tr. 1-71:9-12. Alexandrescu led the negotiation on behalf of the company. Tr. 1-55:20-24.

In order to determine the fair market value of Russelectric's stock as of the termination date of November 30, 2016, Argent retained Prairie Capital to perform another valuation. Tr. 2-36:7-20, 37:14-16, 38:12-14. The valuation was again based on financial

12

information provided by Russelectric's management. Tr. 2-43:3-9, 44:5-7. Russelectric provided mostly the same financial projections that they had given Prairie Capital for purposes of the annual valuation, along with the total current backlog. Tr. 2-43:3-9, 44:5-7, 45:21-25, 46:17-20; Ex. 542. Because the annual valuation largely had been prepared in September 2016, the Board and company management felt that no major changes had occurred between September and November that warranted altering the financial projections. Tr. 3-45:3-7, 45:14-19. Prairie Capital likewise identified no major changes between September and November 2016 justifying a substantial increase in financial forecasts. Fiore Dep. II at 95:05-10.

After reviewing the financial information and conducting its own independent research, Fiore Dep. II at 39:13-40:01, Prairie Capital determined that Russelectric's stock had a value in the range of approximately $120 to $141 as of November 30, 2016. Tr. 2-48:7-10; Ex. 470. Prairie Capital provided this estimate to Argent. Tr. 4-34:4-13. The valuation was never shared with Russelectric's management, however, despite Alexandrescu's repeatedly requesting it. Tr. 2-36:24-37:4; Tr. 8-54:7-8. Prairie Capital declined to provide the valuation to Alexandrescu because it viewed Russelectric as the counterparty in the redemption transaction, while Argent was Prairie Capital's client. Fiore Dep. II at 112:17-113:18. Similarly, Argent believed that showing

13

Russelectric the valuation report would damage Argent's negotiating position. Tr. 4-37:20-25.

After receiving Prairie Capital's valuation report, Argent made an initial offer to Russelectric's management, suggesting that the ESOP's shares be redeemed at a price of $165 per share. Tr. 1-64:25-65:2. Argent did not provide any information supporting this figure, even after Alexandrescu requested an explanation. Tr. 1-109:14-20; Tr. 8-56:7-11. Argent also did not inform the Board that the offer exceeded Prairie Capital's valuation range of $120 to $141. Tr. 2-48:12-49:8. The $165 offer was not based on any internal financial analysis by Argent, Tr. 4-17:9-11; rather, Argent viewed the offer as higher than fair market value and a "really high price to start a negotiation." Tr. 4-17:6-7; see Tr. 4-17:22-18:5.

Russelectric's Board believed that $165 exceeded fair market value. Tr. 1-64:25-65:6. In response to Argent's offer, Alexandrescu conducted his own analysis and shared it with the Board. Tr. 1-66:9-14. He prepared a worksheet in which he estimated the actual value of Russelectric's stock to be $134 per share. Ex. 701. In Alexandrescu's view, the financial projections from Prairie Capital's annual valuation (which had been prepared very recently in September and October 2016) remained largely the same, except that the company had more cash on hand and decreased liability to the defined benefit plan. Tr. 8-55:9-11; Ex. 701.

Alexandrescu had provided all of this information to Prairie Capital as it prepared the redemption valuation. Tr. 8-57:2-8.

Long and Russelectric's counsel also believed that Russelectric had an important bargaining chip at its disposal. Tr. 1-96:8-14, 98:3-7, 106:13-15; Tr. 2-105:16-106:2. Long told Alexandrescu that under the ESOP's plan document, the company had the right to unilaterally redeem the ESOP's shares at $121 per share based on the most recent annual valuation. Tr. 1-96:8-14, 98:3-7, 106:13-15, 108:6-12, 109:2-5; Ex. 737. This purported right of redemption was known as the "autoput."[4] Long suggested that Alexandrescu inform Martin that unless Argent provided the updated Prairie Capital valuation, the Board would exercise the autoput and purchase the ESOP's stock at $121 per share. Tr. 2-108:6-109:6; Ex. 737.

Armed with the belief that the true fair market value was $134 and that the company could exercise the autoput at $121, Alexandrescu responded to Argent's offer of $165. Alexandrescu presented a counteroffer of $134 per share and stated that if Argent did not accept that amount, the Board would exercise the autoput the next day. Tr. 8-101:14-18. Faced with the possibility

---

[4] Long testified that every ESOP holding non-publicly traded stock has a "put" provision that ensures that participants receive value if the stock is redeemed. Tr. 1-101:15-21. He further testified that many ESOPs have an "autoput" provision, which makes the "put" exchange instantaneous to avoid triggering other corporate consequences. Tr. 1-101:22-102:6.

of receiving only $121 per share, and knowing (but not telling Russelectric) that $134 was above the midpoint of Prairie Capital's valuation range of $120 to $141, Argent decided to accept Alexandrescu's offer of $134 per share. Tr. 1-109:7-13; Tr. 4-37:1-19; Ex. 776.

Russelectric and Argent then negotiated a formal redemption agreement, with each side represented by counsel. Tr. 2-27:3-5, 27:11-14. The redemption agreement provided that the ESOP's allocated stock would be redeemed at $134 per share. Ex. 72. It incorporated the previously negotiated clawback provision. Ex. 72. Argent never asked to renegotiate that provision or to include unallocated shares in the clawback. Tr. 2-29:9-13, 29:18-21; Tr. 3-23:10-17.

On the same day that the redemption agreement was finalized -- November 30, 2016 -- Prairie Capital provided a "fairness opinion" to Argent, which Argent forwarded to Russelectric. Tr. 2-31:21-32:1; Ex. 636. The fairness opinion concluded that the price of $134 per share to be received by the ESOP was "not less than 'fair market value' and constitute[d] 'adequate consideration'" and that "[t]he [t]ransaction, taken as a whole, [wa]s fair to the [ESOP] from a financial point of view." Ex. 636 (quoting 29 U.S.C. § 1002(18)). The Board reviewed the fairness opinion. Tr. 2-56:8-13.

16

The ESOP's shares thus were redeemed on November 30, 2016, at a price of $134 per share. Tr. 1-64:20-24. Each plan participant received $134 multiplied by the number of allocated shares in their account. Tr. 1-37:23-25. Because the value of the unallocated shares was lower than the remaining ESOP loan balance, the unallocated shares were returned to Russelectric and cancelled, the loan was extinguished, and the unpaid loan balance was forgiven. Tr. 1-37:25-38:3, 38:13-14, 73:1-5. No payout was received by plan participants for the unallocated shares. Tr. 1-73:6-14.

John had not been directly involved in the redemption price negotiations, instead recusing himself and allowing Alexandrescu to use Long as his point of contact on the Board. Tr. 2-49:13-15; Tr. 5-67:18-21; Tr. 8-53:13-20. John never communicated directly with Argent or Prairie Capital regarding the transaction. Tr. 5-68:1-6. He did, however, email Alexandrescu, writing: "My personal thanks for your efforts on behalf of the company and my family to get a fair valuation." Ex. 706. He also signed off on the $134 redemption price. Tr. 4-124:21-23. When the redemption transaction was complete, John emailed his siblings, celebrating that the "ESOP ha[d] officially died" and that Russelectric was "once again 100 percent family owned." Ex. 700.

17

## VI.  <u>Siemens Offer</u>

Following the termination of the ESOP, Russelectric's financial performance continued to improve as Alexandrescu's corporate reforms took effect. Several private equity firms had offered to buy the company in 2016, but these offers generally were not taken seriously and John had no interest in selling to a private equity firm at a low price. Tr. 2-67:22-68:2; Tr. 3-62:22-24; Tr. 5-22:3-4; Tr. 8-60:1-4. A more serious offer from Western Commerce was briefly entertained in February 2017, Tr. 3-64:2-7; Tr. 8-112:18-25, as were two offers from AMETEK and Socomec in the summer of 2017, Tr. 2-69:5-13. In connection with the Western Commerce offer, Alexandrescu emailed the Board that he estimated a selling price of $90 million, which corresponded to a substantially higher company value than the valuation of Russelectric during the redemption transaction. Tr. 3-64:2-65:11; Ex. 707.

In late 2017, a major disruption occurred in Russelectric's market when one of the company's main competitors, ASCO, was purchased by Schneider Electric, a supplier of components for Russelectric's electrical equipment. Tr. 1-27:1-2, 27:6-7; Tr. 5-71:9-13. This acquisition posed an existential threat to Russelectric's control over its pricing. Tr. 2-66:23-67:2. As a result, Alexandrescu received permission from the Board to

18

approach Siemens about a potential sale of Russelectric while its value was high. Tr. 5-71:22-72:22.

On February 20, 2018, Siemens sent a letter expressing interest in purchasing Russelectric for $340 million. Tr. 1-110:3-6; Ex. 831. On a per-share basis, this price far exceeded the amount that Russelectric had paid for the ESOP's shares less than three years prior in November 2016. Tr. 7-35:11-36:4. As a result, the clawback provision would be implicated.

## VII. **Clawback Administration**

In conjunction with the imminent sale to Siemens, the Board decided to award bonuses to various members of management and the Russell family. The Board hired Charles Schultz, an executive pay consultant, to advise on the proper magnitude of bonus payments. Tr. 3-49:16-18; Tr. 5-82:12-19. John, Long, and Alexandrescu proposed specific bonus amounts to Schultz, who largely agreed (without much analysis) that they were within reasonable ranges of typical executive bonuses. Tr. 3-52:14-22. Schultz spent only around ten hours on the work. Tr. 5-83:9-20. He was unaware of the existence of a clawback, Tr. 5-87:3-6, and had never advised a company with an ESOP, Tr. 5-98:23-99:9. At trial, Schultz testified that he was unable to produce a complete record of his work for Russelectric because he destroyed some of the files when he retired. Tr. 5-101:17-102:16.

19

On October 1, 2018, the Board accepted a stock purchase agreement authorizing transaction bonuses and expenses of approximately $77 million. Tr. 1-115:7-11, 115:17-116:4; Ex. 390. The Board awarded bonuses of approximately (1) $14 million to John; (2) $11 million to the members of the Advisory Board (Suzanne, Lisa, James, Jennifer Novak, and Matthew), allotted as a pool to be divided by the family as they chose; (3) $3 million to Long; (4) $31 million to six individuals in management, including Alexandrescu and Tejada; and (5) $7 million in additional fees to Alexandrescu and Tejada for the mergers and acquisitions ("M&A") services they provided in connection with the Siemens negotiations. Ex. 40; see Tr. 2-64:18-22.

On October 2, 2018, Siemens and Russelectric entered into an agreement for Siemens to purchase Russelectric for $345 million. Ex. 647. Because the clawback amounts would be based on the "net per share purchase price received by the shareholders" upon a transaction with Siemens, rather than the gross sale price, the Board determined that the bonuses could be deducted from the sale price before calculating the clawback. Ex. 69. Accordingly, former ESOP plan participants received lower clawback payments than they would have if no bonuses had been awarded. Tr. 7-35:11-36:4.

## PROCEDURAL HISTORY

Plaintiffs originally brought suit against John, Suzanne, Lisa, Long, Wyatt, and Argent in March 2022. The Court denied two

20

motions to dismiss in February 2024 and January 2025. See Bowers v. Russell, 717 F. Supp. 3d 165, 177 (D. Mass. 2024) (denying motion to dismiss Counts I-VI); Bowers v. Russell, 763 F. Supp. 3d 90, 101 (D. Mass. 2025) (denying motion to dismiss Counts VII-X). In January 2025, the Court also certified a class consisting of former ESOP participants and beneficiaries. See Bowers v. Russell, 766 F. Supp. 3d 136, 153 (D. Mass. 2025). The Court subsequently entered preliminary approval of settlement agreements between Plaintiffs and Long, Wyatt, and Argent in September 2025, for $1.5 million, $3 million, and $4.5 million, respectively. See Dkts. 434-1 at 5, 491-1 at 5, 560-1 at 4, 569-71. The Court held that it would employ a proportionate share approach in assessing damages to the remaining Defendants (John, Suzanne, and Lisa). See Bowers v. Russell, No. 22-cv-10457, 2025 WL 2740682, at *2 (D. Mass. Sep. 5, 2025). The Court presumes familiarity with these prior opinions.

As relevant here, the operative complaint asserts ten ERISA claims against John, four of which are also brought against Suzanne and Lisa. The claims fall into four categories: (1) claims challenging the decision to exclude unallocated shares from the clawback provision (the "Clawback Negotiation Claims"); (2) claims challenging the adequacy of the consideration received by the ESOP in the November 2016 redemption transaction (the "Redemption Transaction Claims"); (3) claims challenging the decision to award bonuses in relation to the Siemens transaction, which reduced the

clawback payments to plan participants (the "Clawback Administration Claims"); and (4) equitable claims seeking recovery of traceable proceeds due to Defendants' knowingly participating in, and benefitting from, several of the above ERISA violations.

A twelve-day bench trial was held in September and November 2025. After reviewing the trial record and the parties' pretrial, trial, and posttrial briefing, the Court issues the following conclusions of law.

## CONCLUSIONS OF LAW

The Court first addresses, and rejects, two affirmative defenses raised by Defendants. The Court then analyzes the claims asserted against John. Finally, the Court addresses the claims brought against Suzanne and Lisa.

## I.    Affirmative Defenses

At the outset, the Court must address two threshold arguments raised by Defendants. First, Defendants contend that Plaintiffs' claims are barred by the statute of limitations. Second, Defendants assert that Plaintiffs released their claims. As explained below, the Court rejects both arguments.

### A.    Statute of Limitations

ERISA claims must be brought before the earlier of (1) six years after a breach or violation or (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. A plaintiff has "actual

22

knowledge" of a breach if she "knows 'the essential facts of the transaction or conduct constituting the violation.'" Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 142 (1st Cir. 2005) (quoting Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1086 (7th Cir. 1992)). "[M]ere knowledge of facts indicating that 'something was awry'" is insufficient. Id. (quoting Martin, 966 F.2d at 1086).

Defendants argue that Plaintiffs had actual knowledge of the alleged violations more than three years prior to bringing their claims. In particular, Defendants contend that Plaintiffs received a memorandum explaining the redemption transaction in December 2016 and thus that the Redemption Transaction Claims are time-barred. Defendants further argue that the Clawback Negotiation Claims and Clawback Administration Claims are time-barred because Plaintiffs received a letter from Alexandrescu in October 2018 explaining that Plaintiffs would receive clawback payments based on the number of their allocated shares.

This Court has previously explained that to demonstrate actual knowledge for purposes of the Clawback Negotiation Claims, Defendants are required

> to show that Plan participants knew "(1) [that] the Plan possessed unallocated shares of Russelectric stock; (2) that the Plan sold those shares to anyone; (3) that the terms of the ESOP termination sale differed as between allocated and unallocated shares; (4) that the Plan received less for unallocated shares as compared to allocated shares; [and] (5) that the sale of the unallocated shares was tainted by wide-ranging fiduciary misconduct that impacted their valuation."

23

Bowers, 766 F. Supp. 3d at 148 (second alteration in original) (quoting Bowers, 717 F. Supp. 3d at 174)). The testimony at the bench trial does not reflect this degree of actual knowledge. On the contrary, the four named Plaintiffs each testified that they did not even know of the existence of unallocated shares until they were contacted about the litigation. Tr. 4-42:6-9, 60:6-9, 66:18-67:2, 68:24-69:4, 75:20-76:7, 79:2-4, 93:13-15. While the letter sent by Alexandrescu in connection with the Siemens transaction informed certain participants that they would be compensated "based on the number of shares [they] held at the termination of the ESOP," it did not explain that unallocated shares had also existed but not been included in the clawback calculation. Ex. 791; see Tr. 1-74:6-11. The Clawback Negotiation Claims thus are not time-barred.

The Redemption Transaction Claims likewise survive the statute of limitations. Plaintiffs testified that they did not know how the shares had been appraised for purposes of the ESOP termination and had no reason to suspect that they had been undervalued. Tr. 4-42:3-15, 60:10-15, 78:17-23, 93:8-12. The December 2016 memorandum informed participants that the ESOP had been terminated but did not apprise them of any specifics about the valuation process, such as the fact that Argent had requested a higher price or that Alexandrescu had threatened to use the autoput. See Ex. 639. Defendants thus have failed to show that

24

Plaintiffs had actual knowledge of the alleged undervaluation of Russelectric's shares for purposes of the redemption transaction.

Finally, this Court previously held that the Clawback Administration Claims would be time-barred only if Defendants demonstrate that Plaintiffs "knew that the sale price was significantly underreported after Defendants allegedly gave themselves . . . transaction bonuses." Bowers, 766 F. Supp. 3d at 148. Plaintiffs' trial testimony reflects, in contrast, that they were unaware of the bonuses and their impact on the clawback amounts. Tr. 4-42:16-23, 62:5-7, 79:8-10, 94:11-14. The letter sent by Alexandrescu did not notify participants of the bonuses. See Ex. 791. The Clawback Administration Claims therefore are not barred by the statute of limitations.

**B.   Release**

Defendants next contend that Plaintiffs contractually released their claims by signing severance agreements and a release required as a condition of closing for the Siemens transaction. The Court has rejected these arguments at previous stages of the litigation. See Bowers, 717 F. Supp. 3d at 173-74; Bowers, 763 F. Supp. 3d at 97-98; Bowers, 766 F. Supp. 3d at 149-50. The Court incorporates by reference its previous discussions of the releases at issue.

The releases signed as part of the Siemens transaction purported to release all claims against Russelectric directors

(and various other entities and individuals) "arising from, relating to or in connection with, either directly or indirectly, the ESOP, the termination of the ESOP and/or the [Siemens sale]." Ex. 785; see Exs. 787, 789, 791. They further provided that "[n]otwithstanding the foregoing, the term 'Released Claims' shall not include claims brought by Releasors with respect to the performance of the obligations contemplated herein." Ex. 785; see Exs. 787, 789, 791.

The Court previously held that "Plaintiffs plausibly allege[d] that they were completely unaware factually of the unallocated stock and their rights to it, and thus that the releases were void." Bowers, 717 F. Supp. 3d at 174. The Court further held that the release "contain[ed] limiting language that explicitly exclude[d] claims related to the clawback provision from the scope of the release." Bowers, 763 F. Supp. 3d at 97. Defendants provide no reason to deviate from these conclusions, and several lines of testimony from the bench trial buttress them. For example, Bowers was not told that bonuses had been deducted from the gross sales price of Russelectric to Siemens. Tr. 4-56:4-13.

Defendants also allude to severance agreements with releases that were signed by Bowers, Gear-Cole, and Lorenzano (but not by Tercy). Tr. 4-44:14-21, 45:8-10, 72:24-73:5, 74:9-18, 103:7-9, 104:9-19; see Exs. 786, 788. The severance agreements purported to

release all claims against Siemens "and its directors, employees, officers, representatives, agents, shareholders, related entities, affiliates, parents, subsidiaries, and divisions, or their respective predecessors, successors, assigns, directors, employees, officers, representatives, agents, and shareholders." Ex. 786; see Ex. 788.

The Court previously discussed, at the class certification stage, a disagreement among the parties regarding whether the plain language of the severance agreements released claims against Russelectric directors (including John) or only previous Siemens directors. See Bowers, 766 F. Supp. 3d at 149-50. In the Court's view, the severance agreements are best read as releasing claims only against previous Siemens directors -- i.e., "predecessors" of Siemens' "directors." Ex. 786; see Ex. 788.[5] And in any event, Defendants only mention this issue in passing in their pretrial and posttrial briefing and do not meaningfully develop the argument. They thus have not met their burden of demonstrating that Bowers, Gear-Cole, Lorenzano, and similarly situated class members have released their claims through the severance agreements. See Med. Air Tech. Corp. v. Marwan Inv., Inc., 303

---

[5] The bench trial testimony reflects that Gear-Cole did not believe the release would apply to anyone not affiliated with Siemens, Tr. 4-75:9-11, and that Lorenzano did not understand what claims she was releasing, Tr. 4-95:6-9, 103:7-9.

F.3d 11, 18 n.3 (1st Cir. 2002) ("[T]he party seeking to enforce the release bears the burden of proof.").

## II.   Claims Asserted Against John

The Court now addresses the four buckets of claims brought by Plaintiffs against John: (1) the Clawback Negotiation Claims, (2) the Redemption Transaction Claims; (3) the Clawback Administration Claims; and (4) the equitable claims.

### A.   Clawback Negotiation Claims

Plaintiffs first challenge the decision to exclude unallocated shares from the clawback provision. In Count III, Plaintiffs claim that John breached fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1) and failed to monitor Argent. In Count IV, Plaintiffs assert that John is subject to cofiduciary liability under 29 U.S.C. § 1105(a) for knowingly participating in a fiduciary breach committed by Argent.

The parties dispute whether John was a fiduciary with respect to the Clawback Negotiation Claims and, if he was, whether he breached his fiduciary duties. The Court tackles each of these issues in turn. The Court then adjudicates Plaintiffs' arguments that John failed to monitor Argent and is subject to cofiduciary liability.

#### 1.   Fiduciary Status

Two types of fiduciaries exist under ERISA: named and functional fiduciaries. See Mass. Laborers' Health & Welfare Fund

28

v. Blue Cross Blue Shield of Mass., 66 F.4th 307, 316 (1st Cir. 2023). Plaintiffs first contend that Russelectric's Board (including John) was a named fiduciary -- i.e., a person "identified as" a fiduciary "in a plan instrument or pursuant to a procedure specified in the plan," id. (quoting 29 U.S.C. § 1102(a)) -- with respect to the Clawback Negotiation Claims.

The Court agrees. At the time of the clawback negotiation, the ESOP's trust agreement provided that Argent was "subject to the direction of" Russelectric as a "directed trustee as described in ERISA § 403(a)." Ex. 75; see Tr. 1-49:10-13, 49:21-23. That provision of ERISA permits a trustee (here, Argent) to be made "subject to the direction of a named fiduciary." 29 U.S.C. § 1103(a)(1). The ESOP's plan document, in turn, specified that "[a]ny action authorized . . . to be taken by [Russelectric] . . . under the Plan shall be by resolution of its board of directors." Ex. 590. These plan instruments thus "identified" the Board as a named fiduciary with the power to direct Argent and the "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a). That named fiduciary status is attributable to the individual Board members, including John. See Stein v. Smith, 270 F. Supp. 2d 157, 168-69 (D. Mass. 2003) (holding that corporate committee's named fiduciary status was attributable to individual committee members). Indeed, the Board passed a resolution that gave John the

29

authority to replace Argent at any time with a different ESOP trustee. Tr. 1-24:4-15; Ex. 8.

Plaintiffs also argue that the Board was a functional fiduciary. "A person is a functional fiduciary 'with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.'" Mass. Laborers' Health & Welfare Fund, 66 F.4th at 316 (emphasis omitted) (quoting 29 U.S.C. § 1002(21)(A)(i)). Because "a person can be a fiduciary 'for some purposes and not for others,'" courts must assess functional fiduciary status with respect to the specific challenged activities. Id. at 317 (quoting In re Fid. ERISA Fee Litig., 990 F.3d 50, 55 (1st Cir. 2021)).

The Court agrees that the Board, in addition to being a named fiduciary, served as a functional fiduciary with respect to the Clawback Negotiation Claims because it "exercise[d] . . . discretionary authority or discretionary control respecting management of" the ESOP. 29 U.S.C. § 1002(21)(A)(i). A party has discretionary authority respecting plan management when it "select[s] from a range of options in" managing the plan. Mass. Laborers' Health & Welfare Fund, 66 F.4th at 318. Here, the claims at issue challenge the Board's decision to include allocated

shares, but not unallocated shares, in the clawback provision. The choice to exclude unallocated shares was a discretionary one.

### 2. Breach of Fiduciary Duties

Having determined that John, as a member of the Board, was a fiduciary with respect to the Clawback Negotiation Claims, the Court now must analyze whether he breached any fiduciary duties. "A claim for breach of a fiduciary duty under ERISA includes proving a breach, a loss, and the causal connection between the two." Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 19 (1st Cir. 2024). Plaintiffs must "show[] a breach of fiduciary duty and loss to the plan," at which point "the burden shifts to the fiduciary to prove that such loss was not caused by its breach." Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 39 (1st Cir. 2018).

"ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets." Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 412 (2014). Under ERISA's duty of prudence, "a fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" Brotherston, 907 F.3d at 30 (quoting 29 U.S.C. § 1104(a)(1)(B)). "[T]he content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary

acts." Barchock v. CVS Health Corp., 886 F.3d 43, 44 (1st Cir. 2018) (second alteration in original) (quoting Dudenhoeffer, 573 U.S. at 425).

Under ERISA's duty of loyalty, "fiduciaries 'shall discharge their duties with respect to a plan "solely in the interest of the participants and beneficiaries," that is, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."'" Brotherston, 907 F.3d at 39-40 (quoting Pegram v. Herdrich, 530 U.S. 211, 223-24 (2000)); see 29 U.S.C. § 1104(a)(1)(A). "[T]he duty of loyalty requires the fiduciary to 'deal fairly and honestly with beneficiaries' so as 'to ensure that a plan receives all funds to which it is entitled.'" Cunningham v. Cornell Univ., 604 U.S. 693, 696 (2025) (citations omitted) (first quoting Varity Corp. v. Howe, 516 U.S. 489, 506 (1996); and then quoting Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 571 (1985)). In analyzing a claim of breach of the duty of loyalty, courts "ask[] whether the fiduciary's 'operative motive was to further its own interests.'" Brotherston, 907 F.3d at 40 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 6 (1st Cir. 2018)).

Plaintiffs contend that John breached the duties of prudence and loyalty by failing to include unallocated shares in the clawback provision. The Court disagrees. Although John voted to

approve the clawback agreement, Tr. 5-14:14-16, he recused himself from the negotiation, instead allowing Long to take the lead for Russelectric. Tr. 1-42:15-20; Tr. 2-49:20-22; Tr. 4-112:1-2, 115:13-18. More importantly, even if John had been personally involved in the formulation of the clawback provision (he was not), Plaintiffs have failed to show that excluding unallocated shares from the provision was imprudent or disloyal.

At the outset, the Court notes that the Board's assent to Argent's request for a three-year clawback provision was a prudent act that was beneficial to the ESOP's participants. The plan documents did not provide for a clawback, Tr. 1-24:20-24, and at the time of the clawback negotiation, clawbacks were less common than they are today in sales of privately held stock, Tr. 1-31:12-32:3. Argent viewed the three-year term of the clawback provision as very favorable to the ESOP. Tr. 4-25:4-6. Long testified that in more than fifty clawback provisions he saw in his career, none of them had a term that long, Tr. 2-57:10-23, and Plaintiffs' experts both acknowledged that the length of the clawback was appropriate, Tr. 6-68:22-69:6, 121:17-122:2.

As to the treatment of unallocated shares, Argent never requested that the unallocated shares be included in the clawback provision, and Argent had never heard of such an arrangement. Tr. 4-22:4-8. Long, John, and Russelectric's ERISA counsel likewise testified that the thought of including unallocated shares in the

33

clawback never even occurred to them because they had never heard of unallocated shares being included in such a provision. Tr. 1-29:20-23, 32:4-8, 42:15-21; Tr. 2-5:16-22, 57:10-23, 91:11-19, 92:4-13, 98:7-13; Tr. 4-114:23-25. The testimony reflected that including unallocated shares in the clawback would have been atypical given that unallocated shares act as collateral for the unpaid ESOP loan balance. Tr. 1-32:25-33:3. If the value of the unallocated shares had exceeded the loan balance at the time of a redemption of ESOP stock, the surplus value would have been allocated to participants and thus included in a future clawback. Ex. 245.

Expert testimony at the bench trial was not to the contrary. Defendants' expert Richard May[6] had never heard of a clawback agreement including unallocated shares. Tr. 9-100:15-17. Plaintiffs' expert Kelly Driscoll[7] testified that although other types of agreements often protect unallocated shares, she has not seen a clawback that includes unallocated shares. Tr. 6-37:16-

---

[6] May has a graduate business degree and works at American Working Capital, providing advisory services to company boards on corporate governance issues. Tr. 9-90:1-23. He has advised various boards in ESOP-related transactions. Tr. 9-90:24-91:19.

[7] Driscoll is an attorney who has worked primarily with State Street Global Advisors, representing the company's defined contribution business (with a focus on ESOPs) and leading its independent fiduciary business. Tr. 6-28:10-17. She was personally involved in negotiating various ESOP stock transactions. Tr. 6-29:7-10.

38:6, 39:18-20, 40:17-41:7. And Plaintiffs' expert Dana Messina[8] testified he has not seen a clawback provision either expressly include or exclude unallocated shares. Tr. 6-114:25-115:5, 119:10-21. The Court finds that the weight of the evidence supports Defendants' position that excluding unallocated shares was not a breach of fiduciary duties.

Plaintiffs resist this conclusion with several arguments. First, Plaintiffs' experts pointed out that the circumstances here were unusual in that an ESOP was being terminated relatively early in its lifespan, when most of its shares remained unallocated. Tr. 6-31:1-3, 39:18-20; Tr. 6-106:14-107:2. But it is Plaintiffs' burden to demonstrate a breach of fiduciary duties, see Brotherston, 907 F.3d at 39, and they fail to show that including only allocated shares in a clawback provision -- even in an unusual circumstance such as this one -- constitutes an insufficiently prudent and loyal course of action.

Second, Plaintiffs point out that the clawback negotiation took place approximately eight months before the redemption transaction, such that no one knew whether the unallocated shares would be underwater (and thus expended in full to repay a portion

---

[8] Messina has a business degree, has worked in investment banking, and was the CEO of Steinway for fifteen years. Tr. 6-102:21-103:19. He also has consulted with the Department of Labor for several decades, providing expert testimony and investigative work for ESOP-related valuations. Tr. 6-103:22-104:13.

of the outstanding ESOP loan balance) or would exceed the loan balance. Tr. 1-35:16-36:6. But the testimony reflects that the clawback agreement was executed early in the year at Argent's request. Tr. 2-119:2-14. And in any event, Plaintiffs fail to explain why the uncertainty as to the unallocated shares' value would change the calculus on whether it was customary or appropriate to include them in a clawback provision.

Third, Plaintiffs highlight Long's comment that he "expected [Martin] to have counsel review" the clawback provision, Ex. 732, and Russelectric's corporate counsel's statement that the negotiation "was easier than [he] expected," Ex. 729. These comments do not indicate that the Board viewed the clawback provision as unfavorable to the ESOP participants. And the Board's comments were not related to the exclusion of unallocated shares, which is "the action subject to complaint." Pegram, 530 U.S. at 226.

> ### 3.   Duty to Monitor and Cofiduciary Liability

In addition to having fiduciary duties of its own, the Board "had an obligation to monitor [Argent] to prevent [it] from approving an unfair deal" with respect to the clawback negotiation. Bowers, 717 F. Supp. 3d at 175. That is because board members "who appoint plan administrat[ors] have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees." Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011). In such

36

circumstances, "individual [board] members can be found individually liable for a failure to monitor the administrator of the plan." Bowers, 717 F. Supp. 3d at 175; see id. ("Implicit in the power to appoint fiduciaries is the duty to monitor and 'to take action upon discovery that the appointed fiduciaries are not performing properly.'" (quoting Kling v. Fid. Mgmt. Tr. Co., 323 F. Supp. 2d 132, 142 (D. Mass. 2004))). This duty to monitor, however, does not "require every appointing Board member to review all business decisions of [p]lan administrators," as such a stringent requirement "would defeat the purpose of having trustees appointed to run a benefits plan in the first place." Howell, 633 F.3d at 573.

Similarly, a fiduciary may be held liable under ERISA's cofiduciary provisions

> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of [an]other fiduciary, knowing such act or omission is a breach;
>
> (2)  if, by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). In other words, "[c]o-fiduciary liability inheres if a fiduciary knowingly participates in or conceals

37

another fiduciary's breach, enables such other to commit a breach, or learns about such a breach and fails to make reasonable efforts to remedy it." Parmenter, 93 F.4th at 26 (quoting Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 18-19 (1st Cir. 1998)). Notably, however, § 1105(a) "contemplates active steps in furtherance of the breach"; where there is no evidence that a fiduciary "knowingly participated in, concealed, enabled, or failed to intercede in any way to influence [the other fiduciary's] decision," cofiduciary liability will not attach. Id. at 27.

Accordingly, under both a failure-to-monitor theory and a cofiduciary liability claim, Plaintiffs must demonstrate (among other things) that Argent itself breached a fiduciary duty or otherwise acted improperly. Plaintiffs have failed to make that showing with respect to the Clawback Negotiation Claims. Argent proactively requested and obtained a three-year clawback provision, which it viewed as favorable to the ESOP. Tr. 1-28:15-20, 29:4-12; Tr. 4-25:4-6. The Board felt that Argent was properly performing its fiduciary duties in advocating for the provision. Tr. 1-20:9-19.[9] And the testimony of Argent witnesses reflected

---

[9] John did not personally monitor the clawback negotiation, instead allowing Long to do so on the Board's behalf. Tr. 1-42:15-20; Tr. 2-49:20-22; Tr. 4-112:1-2, 115:19-21, 115:13-18. Plaintiffs do not contend that every Board member must individually monitor the appointed fiduciary in order to collectively satisfy the Board's duty to monitor. In any event, Argent committed no wrongdoing in the clawback negotiation.

38

that the clawback provision was discussed internally, Tr. 4-10:5-15; Martin Dep. at 53:10-54:03; that Argent had its own counsel, Tr. 4-27:15-16; and that Argent believed the clawback negotiation was conducted fairly, Tr. 4-27:10-14.

Because Plaintiffs have failed to meet their burden of demonstrating that John breached fiduciary duties, failed to monitor Argent, or is subject to cofiduciary liability, judgment will enter for John with respect to the Clawback Negotiation Claims in Counts III and IV.

**B.    Redemption Transaction Claims**

Plaintiffs next claim that John violated ERISA in connection with the November 2016 redemption transaction. In Count I, Plaintiffs assert that the redemption transaction constituted a prohibited transaction between the ESOP and parties in interest in violation of 29 U.S.C. § 1106(a)(1)(A) and (D). In Count II, Plaintiffs argue that the redemption transaction constituted a prohibited transaction between the ESOP and fiduciaries in violation of 29 U.S.C. § 1106(b)(1) and (3). In Count III, Plaintiffs claim that John breached fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1) and failed to monitor Argent. And in Count IV, Plaintiffs assert that John is subject to cofiduciary liability under 29 U.S.C. § 1105(a) for knowingly participating in a fiduciary breach committed by Argent.

ERISA's prohibited transactions provisions "supplement[] the fiduciary's general duty of loyalty . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" Brotherston, 907 F.3d at 25 (quoting Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 241-42 (2000)); see Cunningham, 604 U.S. at 697. As relevant here, ERISA prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . . [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(A), (D). As also relevant, ERISA prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account" and from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Id. § 1106(b)(1), (3).

Defendants do not dispute that if John is a fiduciary, the redemption transaction was a prohibited transaction under these provisions, as it redistributed ESOP assets to Russelectric and to John. See id. § 1002(14)(A), (C) (defining "party in interest" to include "any fiduciary" and the "employer" of plan participants). Defendants maintain, however, that John was not a fiduciary with

40

respect to the redemption transaction. They further contend that even if John was a fiduciary, an exception to the prohibited transaction provisions applies because the redemption transaction was "for adequate consideration." Id. § 1108(e)(1); see Brotherston, 907 F.3d at 25 (noting that "the prohibition of [§] 1106(a)(1) on transactions with parties-in-interest applies '[e]xcept as provided in [§] 1108'" (second alteration in original) (quoting 29 U.S.C. § 1106(a)(1))); Solis v. Webb, 931 F. Supp. 2d 936, 947 (N.D. Cal. 2012) (noting that § 1108(e) also provides "a statutory exemption to [§ 1106(b)'s self-dealing] restriction with respect to ESOPs").

The analysis under Count III, which alleges a breach of the fiduciary duties of prudence and loyalty, amounts to the same inquiries because "the focus of the adequate-consideration inquiry rests on the conduct of a fiduciary, as judged by ERISA's 'prudent man' standard of care." Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A., 919 F.3d 763, 770 (4th Cir. 2019); accord, e.g., Perez v. Bruister, 823 F.3d 250, 263 (5th Cir. 2016); Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996). The questions for the Court under Counts I-III, therefore, are (1) whether John was a fiduciary, and (2) whether the redemption transaction was for adequate consideration. The Court addresses each of these questions in turn and then resolves

41

Plaintiffs' duty-to-monitor theory and their claim of cofiduciary liability under Count IV.

### 1.    Fiduciary Status

Because "a person can be a fiduciary 'for some purposes and not for others,'" the Court must newly determine whether John acted as a fiduciary with respect to the Redemption Transaction Claims. Mass. Laborers' Health & Welfare Fund, 66 F.4th at 317 (quoting In re Fid. ERISA Fee Litig., 990 F.3d at 55). At the outset, the Court notes that the Board (and John) was no longer a named fiduciary at the time of the redemption transaction. Rather, the redemption transaction occurred under an engagement agreement that conferred "discretionary trustee" status on Argent, such that Argent "assume[d] the fiduciary responsibility for determining . . . whether the price the [c]ompany pays the ESOP for the stock in the [p]roposed [t]ransaction is adequate consideration." Ex. 124; see also Ex. 75 (previously designating Argent as a directed trustee "[o]ther than to the extent [Argent] is appointed . . . as [a] [d]iscretionary fiduciary").

Nevertheless, the Court still must assess whether John acted as a functional fiduciary with respect to the Redemption Transaction Claims. It is true that John testified that he was recused from the redemption transaction price negotiations, Tr. 2-49:13-15; Tr. 8-53:13-20, and was not involved in communicating with Argent or Prairie Capital, instead delegating that task to

42

Alexandrescu, Tr. 5-39:15-40:3, 68:1-10. But the Board (including John) ratified and authorized all actions taken by Alexandrescu with respect to the redemption transaction. Tr. 1-57:6-9; Ex. 383. Moreover, John signed off on the $134-per-share redemption price. Tr. 4-124:21-23. Although "an employer's decision whether to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations," Beck v. PACE Int'l Union, 551 U.S. 96, 101 (2007), the Redemption Transaction Claims do not challenge John's decision to terminate the ESOP -- rather, they challenge his role in determining what value was received by plan participants upon termination. John approved the level of compensation and thereby exercised authority over the management of plan assets. See 29 U.S.C. § 1002(21)(A)(i). He thus was "wear[ing] [a] fiduciary hat" with respect to the Redemption Transaction Claims. Pegram, 530 U.S. at 225.

### 2.    Adequate Consideration

The Court next must determine whether Defendants have shown that the redemption transaction was for "adequate consideration." 29 U.S.C. § 1108(e)(1). A transaction is for adequate consideration if the price paid was "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." Id. § 1002(18). Courts also assess whether the fiduciary acted prudently, see Brundle, 919 F.3d at 770, and whether the consideration was "the product of a determination made by the

43

fiduciary in good faith," id. at 770 n.2 (quoting Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17632, 17633 (proposed May 17, 1988)); see also id. ("[I]n practice, the 'fair market value' inquiry overlaps considerably with the 'good faith' inquiry." (alteration in original) (quoting Henry v. Champlain Enters., Inc., 445 F.3d 610, 619 (2d Cir. 2006) (Sotomayor, J.))). Because the § 1108(e) exception is an affirmative defense to "an otherwise prohibited transaction, the fiduciary bears the burden of proving by a preponderance of the evidence that the sale was for adequate consideration." Id. at 770; see Cunningham, 604 U.S. at 696 ("[I]t is defendant fiduciaries who bear the burden of pleading and proving that a § 1108 exemption applies to an otherwise prohibited transaction under § 1106.").

Defendants have met their burden of demonstrating that the redemption transaction was for adequate consideration and thus was compliant with fiduciary obligations and exempt from ERISA's prohibited transaction provisions. See, e.g., Brundle, 919 F.3d at 770. The evidence from the bench trial supports this conclusion.

First, the Board was aware that Argent retained Prairie Capital to conduct a new financial valuation in support of the redemption transaction negotiations. Tr. 1-60:21-61:9. "Having independent financial advice from a reputable firm is a good start to a fair market value determination . . . ." Brundle ex rel.

44

Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A., 241 F. Supp. 3d 610, 633 (E.D. Va. 2017), aff'd, 919 F.3d 763. Still, "[t]he fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." Howard, 100 F.3d at 1489 (citations omitted). "[T]he fiduciary is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." Id. at 1490.

Here, the Board understood that Prairie Capital was a well-known valuation firm that had performed hundreds of ESOP valuations. Tr. 1-14:9-11. Defendants' valuation expert, Jeffrey Tarbell,[10] viewed Prairie Capital's reputation as "[e]xcellent." Tr. 8-136:4. Throughout the redemption valuation process, Russelectric's management provided Prairie Capital all the financial information that Prairie Capital requested, never concealing information or providing inaccurate data. Fiore Dep. II at 89:05-90:01; Tr. 2-43:3-9, 44:5-7, 46:1-7, 46:17-20; Tr. 8-52:2-10; Ex. 542. Alexandrescu provided Prairie Capital the same

---

[10] Tarbell has a business degree, with an emphasis on finance, and works in investment banking at Houlihan Lokey. Tr. 8-125:18-126:3. He specializes in the valuation of closely held companies, with approximately half of his work relating to ERISA and ESOPs. Tr. 8-126:4-11.

budget projections that he gave to the Board, and he kept Prairie Capital informed about new products, sales channels, markets, aftermarket sales opportunities, and lean manufacturing initiatives. Tr. 8-41:11-45:13; Ex. 188. Although the Board did not review Prairie Capital's valuation, that is because Argent refused to provide it to the Board (despite Alexandrescu's repeated requests) and instead determined that keeping the valuation confidential would best serve the ESOP's interests. Tr. 8-54:7-8; Fiore Dep. II at 112:17-113:18.

Next, Defendants have demonstrated that the financial projections provided to Prairie Capital were appropriate. Argent reviewed the financial data underlying the June 30, 2016, annual valuation and determined that they were satisfactory. Tr. 4-32:2-25. Those financial projections were largely prepared in September and October 2016. Tr. 8-36:12-17, 38:6-21; Ex. 99. The determination by Russelectric's management and Board that the same projections were applicable in November 2016 was reasonable given the short amount of time that had elapsed. Tr. 2-45:21-25; Tr. 3-45:3-7, 45:14-19. Indeed, Prairie Capital independently concluded that no major changes had occurred between September and November 2016 to justify substantially increasing financial forecasts. Fiore Dep. II at 39:13-40:01, 81:17-24, 95:05-10. Alexandrescu also provided Prairie Capital with updated figures regarding the company's cash on hand and pension liability. Tr. 1-91:2-15, 92:16-

46

18; Tr. 8-57:2-8. Defendants' valuation expert, Tarbell, testified that Prairie Capital's financial projections were reasonable. Tr. 9-16:14-19.

Plaintiffs object that the financial projections provided to Prairie Capital did not account for the various positive developments occurring at Russelectric. But the trial testimony reflects that most of these developments were only beginning to percolate in late 2016. Alexandrescu was hired in May 2016 and did not build out the company's new management team until the fall of 2016. Tr. 1-76:1-3; Tr. 2-21:25, 54:24-55:1; Tr. 8-17:8-20, 18:9-16. The improvements he made to the company's financial reporting structure, product base, sales force, aftermarket sales, and lean manufacturing took time to take effect. Tr. 1-84:2-13; Tr. 2-22:4-23:1, 2-23:9-15; Tr. 5-76:3-6; Tr. 8-12:20-13:8, 13:23-14:17. Russelectric's backlog began to increase in October 2016, but many of its new sales and bookings did not come to fruition until mid-2017. Tr. 1-76:24-77:1, 77:5-8; Tr. 8-20:1-10, 23:2-4. Given that Alexandrescu's corporate reforms did not begin to have an impact until late 2016 and that the recent annual valuation had already taken into account some of these anticipated changes, it was reasonable for the financial projections to stay largely the same.

Plaintiffs also take issue with Russelectric's tough-guy negotiating posture and specifically with Alexandrescu's threat to use the autoput. Alexandrescu acted as a counterparty to Argent in

the redemption transaction, and Argent and Prairie Capital viewed him as such. Tr. 4-17:6-7; Fiore Dep. II at 112:17-113:18. But there is no evidence that John had any involvement in the autoput discussions or that this negotiating tactic resulted in an inadequate redemption value. On the contrary, the autoput was never used, Tr. 2-51:12-14, and the ultimate redemption value of $134 was above the midpoint of Prairie Capital's valuation range of $120 to $141, Tr. 1-109:7-13; Tr. 4-37:1-19; Ex. 776. Although Argent had initially requested the higher value of $165, it did not provide any information to support this figure, which it simply viewed as a "really high price to start a negotiation." Tr. 4-17:6-7; see Tr. 1-109:14-20; Tr. 4-17:22-18:5; see also Cooke v. Lynn Sand & Stone Co., 70 F.3d 201, 205 (1st Cir. 1995) (noting that ERISA does not necessarily require "maximiz[ing] the award to the beneficiary").

Next, Plaintiffs point to several outside offers to buy Russelectric, arguing that they demonstrate that the redemption value was underestimated. First, Plaintiffs emphasize that Alexandrescu calculated a share value higher than $134 in relation to an offer from Western Commerce in February 2017. Tr. 3-64:2-7; Tr. 8-112:18-25. But witnesses explained at trial that the comparison was inapt because the redemption valuation assessed the fair market value of the ESOP's shares (a noncontrolling interest), while the Western Commerce estimate was for an 100% interest and

48

therefore included a premium for a controlling interest and the ability to strip the company of its liabilities (such as the company's defined benefit plan) and operating costs. Tr. 3-65:7-16; Tr. 8-117:14-17, 119:3-14. Plaintiffs also highlight offers received from AMETEK and Socomec in the summer of 2017. Tr. 2-69:5-13. But between November 2016 and the time of these offers, various improvements had taken effect at Russelectric, including new product lines and lean manufacturing. Tr. 3-72:22-73:9.

Prairie Capital's fairness opinion also weighs toward finding that adequate consideration was paid for the ESOP's shares. The fairness opinion concluded that the price of $134 per share was "not less than 'fair market value' and constitute[d] 'adequate consideration'" and that "[t]he [t]ransaction, taken as a whole, [wa]s fair to the [ESOP] from a financial point of view." Ex. 636 (quoting 29 U.S.C. § 1002(18)). The Board reviewed the fairness opinion when consummating the transaction. Tr. 2-56:8-13. One of Plaintiffs' experts agreed that requesting a fairness opinion was a prudent action by Argent, Tr. 6-92:1-5, and the Court likewise finds that the Board acted sensibly by reviewing the opinion.

The bulk of Plaintiffs' objections to the $134-per-share consideration was presented by their valuation expert, Dana Messina. Messina conducted his own valuation and concluded that Russelectric's shares were worth approximately $436 per share at the time of redemption. Tr. 7-71:10-12. Messina offered various

49

critiques of Prairie Capital's valuation. Although the Court finds Messina qualified and credible, his critiques ultimately do not persuade the Court that $134 per share constituted inadequate consideration for the following reasons.

Messina first testified that Prairie Capital failed to take into account increased demand and backlog of orders. Tr. 6-142:8-11. But he agreed that Russelectric provided accurate backlog data: "[T]here were criticisms I could make of the company, but not that they didn't give Prairie [Capital] the numbers." Tr. 7-129:20-21; see Tr. 7-129:13-21. Although Messina faulted the Board for failing to correct the errors he perceived in Prairie Capital's backlog calculations, he acknowledged that the Board never received the redemption valuation because Argent and Prairie Capital chose not to share it. Tr. 7-130:1-5, 131:22-25. Furthermore, Prairie Capital did analyze the data, including by differentiating between released and unreleased backlog. Fiore Dep. II at 100:18-102:04.

Next, Messina stated that Prairie Capital should have accounted for the anticipated decrease in pension expenses due to Russelectric freezing its defined benefit plan. Tr. 6-133:8-12, 136:11-19, 137:19-20, 142:21-24. But Prairie Capital reasoned that the pension funds were being relocated to other expenses such as an employer contribution to 401(k) plans. Tr. 7-56:19-24, 58:19-59:2. Prairie Capital's witness maintained that no error in the pension liability calculations had been made. Fiore Dep. I at

50

155:06-156:16. And again, Russelectric gave Prairie Capital the necessary information about the upcoming decrease in pension payments. Tr. 7-59:3-6.

Messina also testified that Prairie Capital failed to account for improved margins due to lean manufacturing efficiencies. Tr. 6-144:22-25, 145:8-21, 146:12-21. But Messina admitted in his deposition that he did not know which aspects of the lean manufacturing initiative had been completed by November 2016. Tr. 7-72:8-22. And the trial record reflects that many of those improvements were made in late 2016 or 2017; indeed, as of October 2016, when Tejada toured Russelectric's facilities, he still felt as if he was "stepping back in a time capsule." Tr. 7-72:5; see Tr. 7-71:23-72:7.

One of Messina's primary critiques of Prairie Capital related to its use of a 16% discount rate in its discounted cash flow ("DCF") analysis. Tr. 6-148:5-19. Messina faulted Prairie Capital for assuming an all-equity capital structure rather than an efficient capital structure of a mixture of equity and cash. Tr. 6-148:25-149:21, 150:20-24. But Prairie Capital's approach was based on the fact that Russelectric in fact used an all-equity capital structure, Tr. 6-148:25-149:21, and Messina acknowledged that a hypothetical buyer of a 30% stock interest -- i.e., the amount of shares held by the ESOP -- would not be able to change a company's capital structure. Tr. 7-76:7-12. Defendants'

51

valuation expert, Tarbell, testified that a DCF analysis must use the perspective of this hypothetical willing buyer and seller, and Prairie Capital's corporate representative testified that it used that approach. Tr. 8-137:2-9, 137:18-138:4; Tr. 9-10:13-18, 11:8-11; Hughes Dep. at 33:01-12. That hypothetical-willing-buyer approach is the method discussed in Valuing a Business, a valuation treatise contributed to by Tarbell which Messina admitted is relied upon as an authoritative text on appraisal practices by various professionals. Tr. 7-44:11-17; Tr. 8-130:4-11; Hughes Dep. at 33:01-12. Messina further admitted that the choice of discount rate is a "reasonable point of debate." Tr. 7-79:24-25. In addition, Tarbell's valuation methods followed the Uniform Standards of Professional Appraisal Practice, while Messina's valuation approach was not tethered to any uniform valuation standards. Tr. 7-43:10-44:10; Tr. 8-134:8-12.

Similarly, Messina objected to Prairie Capital valuing the ESOP's assets on a minority basis. Tr. 6-151:6-15. Prairie Capital viewed a control premium as unwarranted because the ESOP owned only a 30% stake, Fiore Dep. II at 105:18-106:05, while Messina viewed the minority discount as inappropriate because the ESOP was selling its shares to a majority holder (i.e., the company), Tr. 6-151:11-15, 152:10-14. While this is a reasonable point of view, Prairie Capital's approach was deemed correct by Tarbell, who stressed that the ESOP's block would be viewed by a hypothetical

willing buyer as a noncontrolling investment with limited marketability. Tr. 9-54:17-20. The Court again finds that it was not imprudent for Prairie Capital to use the hypothetical-willing-buyer approach.

Another critique levied by Messina related to Prairie Capital's use of the guideline company method (an alternative valuation method to DCF). Tr. 6-147:25-148:4. Messina testified that Prairie Capital was not provided with information about M&A activity in the industry or about offers to buy Russelectric. Tr. 6-152:15-153:9. This criticism gives pause. But the only industry M&A activity that Alexandrescu was aware of at the time was the sale of ASCO to a private equity firm in 2016 (the year before its sale to Schneider Electric), which was public information that Alexandrescu believed Prairie Capital actively monitored. Tr. 8-106:25-107:21. Although Alexandrescu should have shared more information about M&A activity with Prairie Capital, the Court cannot conclude that this shortcoming substantially affected Prairie Capital's valuation, especially given that Prairie Capital conducted its own research into industry M&A activity. Hughes Dep. at 61:18-62:08.

In short, Defendants have met their burden of proving that they acted prudently in determining the compensation paid to the ESOP. The evidence supports Prairie Capital's conclusion that Russelectric's stock should have been valued in the range of $120

53

to $141 -- i.e., relatively close to the 2016 annual valuation of $121, see Exs. 99, 472 -- rather than the $436 figure estimated by Messina. The Court takes into account that Messina had performed a separate analysis of Russelectric on behalf of the Department of Labor that used different approaches from his expert report, albeit under different circumstances and with much less time. Tr. 7-85:18-87:7, 110:25-111:7. While Messina had some fair criticisms, the Court is mindful that the cornerstone of the adequate-consideration analysis is "the conduct of a fiduciary, as judged by ERISA's 'prudent man' standard of care." Brundle, 919 F.3d at 770. There is no evidence that the Board did not believe that $134 was a fair valuation of Russelectric's stock (or even slightly above fair value), Tr. 1-65:9-11, and that Argent's offer of $165 was unreasonably high, Tr. 1-64:25-65:6. The Board provided all financial information that Prairie Capital requested. Fiore Dep. II at 89:05-90:01. The ultimate sale price of $134 was above the midpoint of Prairie Capital's valuation range, Tr. 1-109:7-13; Tr. 4-37:1-19; Ex. 776; was deemed to be adequate consideration in Prairie Capital's fairness opinion, Ex. 636; and was within Tarbell's valuation range, Tr. 9-26:20-22. All of these facts reflect a prudent and loyal process that produced a value constituting adequate consideration. Defendants thus have met their burden of showing that the § 1108(e) exemption to ERISA's prohibited-transaction provisions applies.

*3.   Duty to Monitor and Cofiduciary Liability*

The Court briefly addresses Plaintiffs' duty-to-monitor theory and claim of cofiduciary liability with respect to the Redemption Transaction Claims. As with the Clawback Negotiation Claims, these theories of liability fail because Plaintiffs have failed to show any fiduciary breaches or wrongdoing by Argent during the redemption transaction.

As described above, Argent hired Prairie Capital in order to obtain a fair valuation of the ESOP's shares. Tr. 1-60:21-61:9. Argent reviewed Prairie Capital's valuation and determined that Prairie Capital had applied appropriate financial adjustments. Tr. 4-32:2-25. After learning that Prairie Capital's analysis valued the shares in the range of $120 to $141, Argent proposed a $165 share price to Russelectric in attempt to obtain a premium for the plan participants. Tr. 1-64:25-65:2; Tr. 4-17:22-18:5. These efforts resulted in a redemption price above the midpoint of Prairie Capital's valuation range. Tr. 4-37:1-19; Ex. 776. Argent then had an experienced ERISA attorney negotiate the redemption agreement with Russelectric. Tr. 2-27:11-14, 104:12-24. Finally, Argent procured a fairness opinion in order to confirm that the amount paid to plan participants was adequate. Tr. 2-31:21-32:1. These actions were consistent with a prudent fiduciary process that was loyal to the ESOP's participants.

55

The Board was well aware of Argent's actions and viewed them as constituting an appropriate fiduciary process. Although John was not personally involved in the redemption price negotiation or in monitoring Argent, Tr. 2-49:13-15; Tr. 4-129:6-11, he oversaw Alexandrescu and was kept in the loop, Tr. 4-118:25-119:1; Tr. 5-17:1-4, 39:8-14. Long served as Alexandrescu's point of contact, Tr. 8-53:13-20, thus ensuring that the Board monitored Argent and the redemption transaction generally.

In summary, Plaintiffs have failed to meet their burden of showing a fiduciary breach by John or any wrongdoing by Argent, and Defendants have met their burden of demonstrating that the redemption transaction was for adequate consideration. Judgment therefore will enter for John with respect to the Redemption Transaction Claims in Counts I-IV.

### C.    Clawback Administration Claims

Finally, Plaintiffs take issue with the administration of the clawback provision during the Siemens transaction and specifically with John's role in awarding bonuses that reduced the clawback payments to participants. In Count VII, Plaintiffs claim that John breached fiduciary duties in violation of 29 U.S.C. § 1104(a)(1) by diverting sale proceeds to himself, his family, and certain executives. In Count VIII, Plaintiffs assert that John caused the ESOP to engage in a prohibited transaction with parties in interest and fiduciaries in violation of 29 U.S.C. § 1106(a)(1)(D) and

56

(b)(1) and (3). And in Count IX, Plaintiffs invoke 29 U.S.C. § 1132(a)(1)(B) to request plan benefits allegedly owed to them by John.

The Court first addresses Defendants' argument that ERISA does not apply to the Clawback Administration Claims. The Court then determines whether John acted as a functional fiduciary with respect to those claims. Next, the Court analyzes whether Plaintiffs have shown breaches of fiduciary duties and, if so, whether Defendants have demonstrated that those breaches did not cause losses to the ESOP. Finally, the Court assesses Plaintiffs' prohibited transaction claims.

### 1.   *Applicability of ERISA*

At the outset, Defendants maintain that ERISA does not provide causes of action for the Clawback Administration Claims because the ESOP no longer existed at the time of the Siemens transaction. They highlight that the ESOP was terminated in 2016, Tr. 1-64:20-22; that participants' account balances had all been distributed by the end of 2017, Tr. 6-94:10-19; and that the clawback payments were paid directly to participants and were not placed in retirement accounts, Tr. 9-120:10-15.

The Court previously has rejected this argument, see Bowers, 763 F. Supp. 3d at 98-99, and does so again here for the same reasons. As the Court previously explained, the ESOP, despite being formally terminated, "retained a future interest in clawback

57

payments contingent on a subsequent sale of" Russelectric. Id. at 99. "This retained interest qualifies as a plan asset under ERISA," meaning that "ERISA governs Defendants' actions related to the clawback payments." Id.; see id. at 98 ("ERISA governs post-termination activities when a terminated plan retains assets.").

### 2. Fiduciary Status

Plaintiffs argue that John exercised authority over the clawback payments and thus was a functional fiduciary with respect to the Clawback Administration Claims. I agree.

John was intimately involved in the process of awarding bonuses in connection with the sale of the company to Siemens. For example, on March 5, 2018, John suggested that Long meet with Schultz (the executive compensation consultant) to discuss paying executive compensation from sale proceeds. Ex. 712; Tr. 1-112:8-14. John personally lobbied for bonuses for his family, Long, and company executives. Tr. 5-31:22-32:4. And he believed that no one should receive a larger bonus than himself. Tr. 5-32:5-21. Further, John emailed his sisters that larger bonuses would make the clawback payments smaller. Ex. 799. He wrote that if more money was allocated to bonuses, the family would "save" money "from the ESOP clawback." Ex. 799. John thus knew that the bonuses were interrelated with the clawback payments and took affirmative steps to ensure that the bonuses were paid. These actions rendered him a functional fiduciary.

58

The Court rejects Defendants' argument that John's actions were "broader business decisions that simply affected the [ESOP] and its participants." Mass. Laborers' Health & Welfare Fund, 66 F.4th at 322. On the contrary, John understood that the bonus amounts were fundamentally intertwined with the clawback payments. By exercising authority over the bonuses, he likewise exercised control over the clawback payments, which were plan assets. Although "setting (and receiving) executive compensation . . . is a classically corporate act," Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 276 (D. Mass. 2008), it can also be a fiduciary act where, as here, it "directly involve[s] the 'management or disposition of [the plan's] assets,'" id. (second alteration in original) (quoting 29 U.S.C. § 1002(21)(A)(i)); see Bowers, 763 F. Supp. 3d at 99.

### 3.    Breach of Fiduciary Duties

Having determined that ERISA applied to the clawback administration and that John was a functional fiduciary, the Court next turns to the question of whether John breached fiduciary duties.

Plaintiffs first contend that John breached the duty to act "in accordance with [plan] documents and instruments." 29 U.S.C. § 1104(a)(1)(D); see Parmenter, 93 F.4th at 19 (noting that this duty is part of the duty of prudence). They posit that awarding

bonuses was per se incompatible with the text of the clawback agreement.

The Court disagrees. The clawback agreement provided that plan participants would

> receive a cash payment equal to the product of (A) the number of the Company's common stock allocated to such participant's account in the ESOP as of the ESOP Termination Date multiplied by (B) the difference between (i) the <u>per share price of the Company's common stock</u> as of the ESOP Termination Date as determined by a valuation report to be prepared by Prairie Capital; and (ii) the <u>net per share purchase price received by the shareholders</u> of the Company upon the Consummation of the Change of Control Transaction.

Ex. 69 (emphases added). The clawback provision facially distinguishes between the "per share price" of Russelectric stock as of the ESOP termination date -- <u>i.e.</u>, $134 per share -- and the "net per share purchase price received by the shareholders" after the Siemens transaction. <u>Id.</u> The latter language contemplates that the per share price be "net" of certain expenses before being used to calculate the clawback payments. <u>Id.</u> The Board still was bound by corporate and fiduciary duties to deduct only reasonable expenses, but it had no obligation "to maximize the award to the beneficiar[ies]." <u>Cooke</u>, 70 F.3d at 205. Russelectric's corporate counsel testified persuasively that it is customary to deduct transaction expenses and bonuses before shareholders receive the proceeds of a corporate acquisition. Tr. 2-127:10-14. Because the clawback provision allows for the deduction of reasonable bonuses,

Plaintiffs may not "recover benefits due to [them] under the terms of [the] plan" under 29 U.S.C. § 1132(a)(1)(B), and judgment thus will enter for John on Count IX.

Although he was entitled to pay reasonable bonuses, John remained bound by ERISA's duties of prudence and loyalty. He was required to "act 'with . . . care, skill, prudence, and diligence,'" Brotherston, 907 F.3d at 30 (quoting 29 U.S.C. § 1104(a)(1)(B)), and was not entitled to act with the "operative motive" of "further[ing] [his] own interests," id. at 40 (quoting Ellis, 883 F.3d at 6).

Plaintiffs have met their burden of demonstrating that John failed to satisfy these duties. John plainly acted to further his and his family's interests when awarding bonuses in order to "save" money "from the ESOP clawback." Ex. 799. His motives were in fundamental conflict with the interests of plan participants in receiving higher clawback payments. And he failed to act with the diligence of a prudent fiduciary, likely because he did not believe he was a fiduciary at all. Tr. 4-109:11-12. Although John hired Schultz to opine on the reasonableness of the proposed bonus amounts, Ex. 712; Tr. 1-112:8-14; Tr. 2-14:21-23, he did not adequately monitor Schultz's work, which -- as explained in more detail below, see infra Section II.C.4 -- was deficient in various respects. Indeed, Schultz only spent about ten hours analyzing the proposed bonuses, Tr. 5-83:9-20, and he was unaware of the

61

existence of a clawback, Tr. 5-87:3-6. Schultz had never advised a company with an ESOP, Tr. 5-98:23-99:9, and acknowledged at trial that "[y]ou can't make mistakes on an ERISA plan," Tr. 5-99:8-9. By relying on Schultz, who essentially rubber-stamped bonus amounts that John and others proposed with little research, John breached the duties of prudence and loyalty. Tr. 3-49:16-18, 52:14-22.

### 4.   Loss Causation

As described above, Plaintiffs have "shown a breach of fiduciary duty." Brotherston, 907 F.3d at 39. They likewise have demonstrated a "loss to the plan" because the bonuses resulted in decreased clawback payments to plan participants. Id. The burden therefore "shifts to [John] to prove that such loss was not caused by [his] breach." Id. To do so, John must show that the bonuses were "objectively prudent," i.e., that they "most likely would have" been awarded by a prudent fiduciary. Id. John has made this showing with respect to the executive bonuses but not as to the bonuses paid to himself, Long, and the Advisory Board members.

The Court first analyzes the approximately $31 million in bonuses awarded to six individuals in management. Ex. 40. Before the Siemens transaction, each of these individuals received a salary and were enrolled in a long-term incentive plan ("LTIP") that would have provided increasing monetary value the longer the individuals stayed at Russelectric. Tr. 2-6:18-7:2. The bonuses

thus compensated the executives for their lost salary and the forgone opportunity to benefit from the LTIP. Tr. 2-7:14-21. John testified, however, that the bonuses were higher than the executives would have received under the LTIP. Tr. 5-31:15-21. This premium served as a reward for the executives' contributions to the company. Tr. 5-31:15-21.

The largest executive bonus was paid to Alexandrescu. Ex. 40. As described throughout this opinion, Alexandrescu served as CEO during the company's financial rebound and personally secured the acquisition offer from Siemens. Tr. 2-20:1-6, 5-73:1-3. He, more than anyone else at Russelectric, was responsible for saving the company; indeed, John described Alexandrescu's turnaround of Russelectric as akin to a "magic trick." Tr. 5-71:8. Alexandrescu introduced various corporate reforms, ranging from new product development to lean manufacturing. Tr. 2-22:19-23:1, 23:9-15; Tr. 5-76:3-6. Alexandrescu also had a relatively lower salary and higher expected LTIP payments in order to incentivize him to remain at Russelectric long-term. Tr. 2-20:16-23; Tr. 5-45:24-46:12. It thus was reasonable to pay Alexandrescu a premium bonus to replace his expected earnings and reward him for exemplary work. Tr. 2-20:13-15. Schultz advised that Alexandrescu's bonus was reasonable and customary. Tr. 5-65:20-23; Ex. 746. The Court agrees.

The next-largest executive bonus was paid to Tejada, who served as Russelectric's CFO during Russelectric's financial

turnaround. Ex. 40; Tr. 2-54:24-55:1; Tr. 5-58:4-9; Tr. 8-18:9-16. Tejada helped change Russelectric's financial reporting structure, Tr. 2-22:4-18, and was appropriately rewarded.

The other four executive bonuses were paid to Randy Adleman (the Vice President of Sales), Mario Frattaroli (the Director of Operations), Ed Malley (the head of engineering), and John Doran (the head of quality control). Ex. 40; Tr. 5-58:10-60:8. Each of these individuals was rewarded for his role in the company turnaround, including implementing Alexandrescu's vision of developing new products, redesigning Russelectric's factories, and reorganizing the sales force. Tr. 2-22:19-23:15; Tr. 8-12:20-13:8. Plaintiffs do not dispute that these executives made important contributions to the company, and the Court determines that a prudent fiduciary would have awarded them bonuses in line with what they received.

Alexandrescu and Tejada each received an additional fee to compensate them for their M&A work leading up to the Siemens transaction. Ex. 40. This work was performed on top of their regular responsibilities, and it allowed Russelectric to undergo the transaction without paying the usual expense of an outside M&A firm. Tr. 2-23:16-23; Tr. 5-62:17-63:5. The fees were based on Schultz's recommendation of what typical M&A fees would be: approximately 2% of the sales price. Tr. 2-23:24-24:7; Tr. 5-

64

63:11-15, 108:18-109:12; Ex. 746. The Court concludes that these additional fees were reasonable.

Although the executive bonuses and M&A fees were reasonable, the bonuses paid to John, Long, and the Advisory Board members were not. None of these individuals were entitled to LTIP payments, Tr. 2-7:22-8:10, meaning that the bonuses were solely designed to replace salary and to reward contributions to the company.

The Court begins its analysis with John, who awarded himself a whopping $14 million for his bonus. Ex. 40. John's annual salary was approximately $160,000, and he was Chairman of the Board. Tr. 3-7:12-22; Tr. 5-53:2-11. In his favor, John worked hard for Russelectric from 2015 to 2019, Tr. 5-54:10-11, and built out the company's management team in order to kickstart the financial rebound, Tr. 3-8:11-16. But although John's contributions to the company are laudable, he has not met his burden of demonstrating that his bonus was reasonable. In advising on John's bonus, Schultz believed that John was the President and CEO of Russelectric in addition to being the Chairman of the Board, and no one corrected this misunderstanding. Tr. 5-83:24-84:9, 85:16-25. Although Defendants' executive compensation expert, Bruce Benesh,[11] testified that John's bonus was reasonable, he acknowledged that

---

[11] Benesh has a business degree, with an emphasis on taxation, and several decades of experience advising companies on executive compensation. Tr. 10-7:2-11:25.

Schultz should have known that John was not the CEO and that knowledge of an individual's role at a company is important in advising on their bonus. Tr. 10-51:17-53:6. Given this deficiency and John's self-interest in securing the largest bonus, Tr. 5-32:5-21, the Court finds that such a huge bonus amount would not have been calculated by a prudent and loyal fiduciary.

Defendants likewise failed to show that Long's approximately $3 million bonus was appropriate. Ex. 40. Long's bonus replaced a low six-figure annual salary, Tr. 2-73:4-18, and rewarded him for his contributions to the company, which included negotiating the clawback agreement and serving as Alexandrescu's Board point of contact during the ESOP redemption negotiations, Tr. 1-29:2-4; Tr. 8-53:13-20. Schultz calculated a significantly lower bonus for Long, and he testified that a seven-digit bonus for a Board member was very large given the scale of the company. Tr. 5-89:6-16, 90:7-15. Similarly, Messina testified that Long's bonus was far higher than equivalents he has seen. Tr. 6-122:17-24, 123:11-17. Notably, after John proposed to Schultz that Long receive an approximate $2.5 million bonus, Schultz "decided to add half a million dollars to the amount because it seemed like a rounder number to" him. Tr. 5-91:4-7. The Court therefore ascribes little weight to Schultz's report's conclusion that Long's bonus was reasonable, see Ex. 772, and instead concludes that Defendants have failed to demonstrate that a prudent fiduciary would have awarded this amount.

66

Finally, the Court turns to the approximately $11 million in bonuses awarded to Russelectric's Advisory Board, which consisted entirely of John's family members: Suzanne, Lisa, James, Jennifer Novak (Suzanne's daughter), and Matthew Russell (John's son). Ex. 40; Tr. 1-119:3-8; Tr. 3-10:13-14, 11:18-19; Tr. 5-121:16-23. The Advisory Board members received their bonuses as a collective pool that they divided amongst themselves. Tr. 2-64:18-22; Tr. 3-52:1-3. The total Advisory Board bonus was approximately 7.2% of the gross sale price to Siemens, which Schultz opined was reasonably close to his recommended bonus range of 5-7% of the gross sale price. Tr. 3-51:13-19; Ex. 784.

Advisory Board members received approximately $40,000 in annual salaries, with Novak earning $80,000. Tr. 1-119:10-12; Tr. 5-54:16-23. They served no role in corporate governance; instead, they attended Board meetings with the long-term goal of becoming more involved in leading the company. Tr. 1-119:21-22; Tr. 3-85:4-8; Tr. 5-121:7-9. While Suzanne, Lisa, and Jennifer Novak attended most Board meetings, Matthew and James typically did not. Tr. 3-9:10-15, 10:22-23, 11:1-5, 11:14-17, 11:24-25. None of the Advisory Board members had much knowledge about Russelectric's industry. Tr. 2-65:12-24.

Although Schultz advised that the collective bonus to the Advisory Board was appropriate, he was unaware of the limited nature of the family members' roles. He assumed that the Advisory

67

Board served an important role in corporate governance and that its members were equivalent to C-suite executives. Tr. 5-86:2-10, 88:3-7. He did not consult with anyone at Russelectric regarding those assumptions and was not informed by company leadership that he was mistaken. Tr. 5-86:11-14. Nor was he provided any details on what the Advisory Board members actually did. Tr. 5-86:15-18. At trial, Schultz testified that when family members are not involved in corporate governance, they typically receive much lower bonuses. Tr. 5-97:11-22. Similarly, while Benesh testified that family advisory board members often get bonuses, he acknowledged the importance of knowing the actual roles of those family members at the company. Tr. 10-46:6-12, 51:17-53:6. Messina testified that he was shocked by the minimal diligence that was used in backing up the bonus amounts. Tr. 7-99:22-100:3. The Court agrees. Given the limited role of the Advisory Board and the deficiencies in Schultz's review of their bonuses, the Court concludes that Defendants have failed to show that a prudent fiduciary would have awarded the bonuses.

Defendants thus have failed to meet their burden of showing that the bonuses awarded to John, Long, and the Advisory Board were objectively prudent. See Brotherston, 907 F.3d at 39. Judgment therefore will enter for Plaintiffs on Count VII with respect to these bonuses (but not the bonuses awarded to the executives).

>    *5.    Prohibited Transactions*

Count VIII presents an alternate theory of recovery under ERISA's prohibited transactions provisions. Plaintiffs claim that John violated 29 U.S.C. § 1106(a)(1)(D) by causing the ESOP to engage in prohibited transactions with parties in interest and contravened 29 U.S.C. § 1106(b)(1) and (3) by conducting a self-dealing transaction as a fiduciary.

The Court rejects Plaintiffs' argument as to § 1106(a)(1)(D). That provision prohibits a fiduciary from knowingly causing an ERISA "plan to engage in a transaction" that "constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Here, John's actions did not cause the ESOP to itself "engage in a transaction," id.; rather, he conducted a transaction (i.e., the payment of bonuses) that impacted plan assets (i.e., the clawback payments).

As to ERISA's self-dealing provisions, the Court disagrees with Plaintiffs as to § 1106(b)(1) but agrees as to § 1106(b)(3). The former provision prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). John did not directly "deal with" the clawback payments; instead, he dealt with bonus payments that directly affected the clawback provision. Id. Section 1106(b)(3), though, provides that a fiduciary may not "receive any

69

consideration for his own personal account . . . in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). John's administration of the bonus payments was "in connection with a transaction involving" the clawback payments because the bonuses were fundamentally intertwined with the amount of the clawback (as John himself knew, see Ex. 799).

Because John entered into a self-dealing transaction under § 1106(b)(3) but did not cause the ESOP to enter a prohibited transaction with parties in interest under § 1106(a)(1)(D), judgment will enter for Plaintiffs on Count VIII to the extent it concerns the bonus to John but not to the extent it concerns other bonuses.

### D.    Equitable Claims

Finally, Plaintiffs assert several equitable claims against John under 29 U.S.C. § 1132(a)(3). In Counts V and VI, Plaintiffs seek to recover traceable proceeds of John's knowing participation in a prohibited transaction and in breaches of fiduciary duties with respect to the clawback negotiation and redemption transaction. In Count X, Plaintiffs seek to recover traceable proceeds from John's knowing receipt of an unlawful bonus as part of the Siemens sale.

As relevant here, § 1132(a)(3) authorizes courts to issue "appropriate equitable relief . . . to redress [ERISA] violations." 29 U.S.C. § 1132(a)(3). That provision "imposes certain duties"

70

such that "liability under th[e] provision does not depend on whether ERISA's substantive provisions impose a specific duty on the party being sued." Harris Tr. & Sav. Bank, 530 U.S. at 245. In particular, plan participants may recover proceeds received by "a transferee of ill-gotten trust assets" in an unlawful transaction where the transferee has "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." Id. at 251.

Because the Court has concluded that no breach of fiduciary duties occurred during the clawback negotiation or redemption transaction and that adequate consideration was paid, see supra Sections II.A.2-3, II.B.1-2, judgment will enter for John on Counts V and VI. See 29 U.S.C. § 1132(a)(3) (authorizing "appropriate equitable relief" to "redress . . . violations" of ERISA or to enforce the statute's provisions (emphasis added)); Harris Tr. & Sav. Bank, 530 U.S. at 246 (noting that § 1132(a)(3) "does not . . . authorize 'appropriate equitable relief' at large, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations" (alterations in original) (quoting Peacock v. Thomas, 516 U.S. 349, 353 (1996))).

Because the Court has determined that an ERISA violation occurred with respect to the bonus paid to John, and because John knew of (and was intimately involved in) the setting of that bonus, see supra Sections II.C.3-5, judgment will enter for Plaintiffs against John on Count X. See Tiara Yachts, Inc. v. Blue Cross Blue

71

Shield of Mich., 138 F.4th 457, 472 (6th Cir. 2025) ("ERISA claims for breach of fiduciary duty and self-dealing are 'equitable in nature.'" (quoting Patterson v. United HealthCare Ins. Co., 76 F.4th 487, 496 (6th Cir. 2023))).[12]

## III.  Claims Asserted Against Suzanne and Lisa

The Court now turns to the four claims against Suzanne and Lisa. In Count IX, Plaintiffs seek "to recover benefits due to [them] under the terms of [the] [P]lan" under 29 U.S.C. § 1132(a)(1)(B), arguing that the clawback provision did not allow the deduction of bonuses from the gross sale price to Siemens. Because, as the Court has explained, see supra Section II.C.3, the plain text of the clawback provision does permit the deduction of reasonable bonuses to the executives, judgment will enter for Suzanne and Lisa on Count IX.

The other three claims against Suzanne and Lisa are equitable claims asserted under 29 U.S.C. § 1132(a)(3). See supra Section II.D (discussing this provision). In Counts V and VI, Plaintiffs seek to recover traceable proceeds of Suzanne's and Lisa's knowing participation in a prohibited transaction and in breaches of

---

[12] The Court leaves for damages briefing whether it should award equitable relief (such as disgorgement) in addition to the relief under Counts VII-VIII, which provide for damages for losses to plan participants. See Mauser v. Raytheon Co. Pension Plan for Salaried Emps., 239 F.3d 51, 58 (1st Cir. 2001) (noting that equitable relief under ERISA is ordinarily available only to the extent it is nonduplicative of other remedies).

fiduciary duties with respect to the clawback negotiation and redemption transaction. In Count X, Plaintiffs seek to recover traceable proceeds from the sisters' knowing receipt of unlawful bonuses as part of the Siemens sale.

Because the Court has concluded that no breach of fiduciary duties occurred during the clawback negotiation or redemption transaction and that adequate consideration was paid, see supra Sections III.A.2-3, III.B.1-2, judgment will enter for Suzanne and Lisa on Counts V and VI. See 29 U.S.C. § 1132(a)(3); Harris Tr. & Sav. Bank, 530 U.S. at 246.

As to Count X, the Court has determined that substantive ERISA violations occurred under the Clawback Administration Claims with respect to the bonuses paid to John, Long, and the Advisory Board members (but not the executives). The Court further concludes, as it now will explain, that Suzanne and Lisa "had actual or constructive knowledge of the circumstances that rendered th[ose] [bonuses] unlawful." Harris Tr. & Sav. Bank, 530 U.S. at 251. They therefore can be held liable as "nonfiduciary parties in interest." Brotherston, 907 F.3d at 36.

Suzanne and Lisa were both members of the Advisory Board during the relevant time period and attended most Board meetings. Tr. 5-116:14-18; Tr. 6-10:16-21. They were kept informed by the Board about developments at the company, Tr. 5-116:19-117:9; Tr.

6-11:6-23, and always read emails that they received from their siblings (including John), Tr. 5-119:5-7; Tr. 6-14:8-10.

Although Suzanne and Lisa had no role in setting the bonuses for Long or Russelectric's executives and did not attend meetings with Schultz, Tr. 5-127:8-21; Tr. 6-22:3-17, the evidence is clear that the sisters knew of the bonuses and their effect on the clawback payments to ESOP participants. Both sisters received, and responded to, John's email in which he wrote that higher bonuses would allow the family to "save" money "from the ESOP clawback." Ex. 799. Suzanne responded:

> PS I have no problem with everyone being handsomely compensated, especially you John! We couldn't have done it without them! We have loyal employees who have stuck with us through thick and thin. They deserve a cut too via the ESOP claw back. They have all done a fantastic job. There is plenty to go around. We will all reap the benefits.

Id. While Suzanne expressed her view that the plan participants "deserve[d] a cut," the Court concludes from the email exchange that she understood that that "cut" would be lower if the bonuses were higher. Id. Similarly, Lisa acknowledged at trial that she was aware that the bonus payments would reduce the clawback amounts. Tr. 6-26:20-25.

The Court thus determines that Suzanne and Lisa knowingly benefited from an ERISA violation by receiving bonuses. Judgment therefore will enter for Plaintiffs against Suzanne and Lisa on Count X.

**ORDER**

For the foregoing reasons, the Court resolves Plaintiffs' claims against John, Suzanne, and Lisa as follows:

1.  With respect to the Clawback Negotiation Claims (in Counts III-IV), the Court finds in John's favor.

2.  With respect to the Redemption Transaction Claims (in Counts I-IV), the Court finds in John's favor.

3.  With respect to the Clawback Administration Claims (Counts VII-IX):

    a.  On Count VII (claim of breach of fiduciary duties), the Court finds in Plaintiffs' favor against John with respect to the bonuses awarded to John, Long, and the Advisory Board members. The Court finds in John's favor with respect to the bonuses awarded to the six Russelectric executives.

    b.  On Count VIII (claim of prohibited transactions), the Court finds in Plaintiffs' favor against John with respect to the bonus awarded to John. The Court finds in John's favor with respect to the bonuses awarded to Long, the Advisory Board members, and the six Russelectric executives.

    c.  On Count IX (claim of failure to pay plan benefits owed), the Court finds in John's favor.

4.  With respect to the equitable claims (Counts V, VI, and X):

   a.  On Counts V and VI, the Court finds in Defendants' favor.

   b.  On Count X, the Court finds in Plaintiffs' favor against all Defendants.

Supplemental briefing is ordered regarding the exact calculation of damages in this complex case. This briefing must also discuss the potential reduction (if any) of damages pursuant to the Court's previous order involving the settlements of Long, Wyatt, and Argent, imposing a proportionate share approach to damages apportionment. See Bowers v. Russell, No. 22-cv-10457, 2025 WL 2740682, at *1-2 (D. Mass. Sep. 5, 2025). In addition, the parties shall brief what equitable remedies the Court should impose under Count X.

Within fourteen days of entry of this order, after conferring, the parties shall file supplemental briefs regarding the calculation of damages. Within fourteen days of those filings, the parties may file opposition briefs. No reply briefs may be filed.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge